# In the United States Court of Federal Claims

No. 05-1006C
(Filed December 20, 2007)

* * * * * * * * * * * * * * * * * * * * * * *

**FOREST GLEN PROPERTIES, LLC,**

Plaintiff,

v.

**THE UNITED STATES,**

Defendant.

* * * * * * * * * * * * * * * * * * * * * * *

Motion to dismiss for lack of subject matter jurisdiction, RCFC 12(b)(1); evidence outside the pleadings; RCFC 56(f); privity; assignment; receiver as a party to a contract; standing; real party in interest; ambiguous contract term; implied-in-fact contract; Housing Assistance Payments contract; jurisdictional facts intertwined with merits.

*Michael D. Rossi*, Guarnieri & Secrest, P.L.L., Warren, Ohio, for plaintiff.

*Andrew P. Averbach*, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Peter D. Keisler*, Assistant Attorney General, *David M. Cohen*, Director, and *Brian M. Simkin*, Assistant Director, all of Washington, D.C., for defendant. *Stacey E. Singleton*, Office of Litigation, and *Gregory G. Gustin*, Associate Regional Counsel, Departmental Enforcement Center, Department of Housing and Urban Development, of counsel.

**MEMORANDUM OPINION AND ORDER**

WOLSKI, Judge.

Pending before the Court is the government's motion to dismiss this case for lack of subject matter jurisdiction. At first blush, the motion appeared to the Court to present a simple matter for resolution. Plaintiff alleges, in a rather spare complaint, that it is the assignee of two Housing Assistance Payments ("HAP") contracts made with the United States Department of Housing and Urban Development ("HUD"). Compl. at 1. The first contract, in writing and attached to the complaint, is a four-month renewal of a HAP contract that expired on September 13, 1999. *See* Att. to Compl. at 1. The second contract is alleged to be an additional renewal on the heels of the first. *See* Compl. at 1-2.[1] Plaintiff attached to the complaint HUD's renewal

---

[1] Although the offered renewal was for a 120-day period, Att. to Compl. at 4, plaintiff maintains that the renewal contract ran from January 14, 2000 through April 14, 2000 -- a ninety-two day period. Compl. at 1-2. Plaintiff also, however, alleges that it provided the relevant housing services for the 120-day period and then some. *See* Compl. at 2 (alleging services were

offer regarding this second contract, *see* Att. to Compl. at 4-5, and alleges that the renewal contract was accepted and performed. Compl. at 2. Damages are sought for the breach of each contract, as plaintiff maintains that payments under the contracts have not been received. *Id.* at 1-2.[2]

After discovery was completed, the government moved to dismiss under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"). The government argues that plaintiff Forest Glen Properties, LLC was neither a party to any contract with HUD nor an assignee of such a contract, and that in any event the second renewal offer was never accepted. Def.'s Mot. at 7-8. The government supports its motion with an appendix containing several documents, most importantly the original HAP contract. This contract contains a clause in which the private party to the contract promises not to assign the contract "without the prior written consent of HUD." *See* Def.'s App. at 34.[3] A letter dated May 10, 2000 is also included, in which HUD informed an attorney representing the plaintiff that "the HAP Contract for the project will not be assigned to the current owner and will not be renewed." *Id.* at 65.

When the Court initially reviewed the motion and materials submitted by the government, it was of the opinion that plaintiff needed to produce evidence of HUD's written consent to the assignment of the HAP contract in order to establish this Court's subject matter jurisdiction. *See* Order (June 14, 2007) at 2. The Court at that time granted the plaintiff leave to file a supplemental memorandum and accompanying exhibits, and permitted an additional reply paper from the government. *Id.* at 3. Now, after having carefully reviewed all of the papers and materials submitted by the parties, the Court finds that the matter is more complicated than it first appeared, due in large part to HUD's decision to deal with a *receiver* rather than the actual owner of the property subject to the HAP contract. As is further explained below, by renewing the HAP contract with a receivership, HUD may have rendered irrelevant the written consent clause of the contract. As a result, the factual questions that will resolve the jurisdictional issue are too intertwined with the merits of the case to be determined via a motion to dismiss. The government's motion is, accordingly, DENIED.

---

provided through June 30, 2000).

[2] A third claim, alleging unjust enrichment, was withdrawn by plaintiff. *See* Pl.'s Notice of Withdrawal (Jan. 17, 2007).

[3] This appendix is spread over two attachments to the motion as filed electronically (Documents 17-2 and 17-3). When citing pages of this appendix, the Court will use the page numbers supplied by the defendant for the appendix as a whole.

## I. BACKGROUND[4]

Plaintiff Forest Glen Properties, LLC ("Forest Glen") owns and operates an apartment complex in Cleveland, Ohio currently known as Forest Glen Apartments, but formerly called Lakeview Gardens. *See* Pl.'s App. at 12.[5] The property at one time belonged to Lakeview Gardens, Ltd., which entered into a HAP contract with HUD in 1984. *See* Def.'s App. at 10-37. Under this contract, which had a term of fifteen years, *see id.* at 11, the owner of the complex agreed to rent forty separate units to eligible lower-income families. *Id.* at 14, 16, 19. The gross rent for each unit was fixed by HUD, as was the portion of the rent that each family would pay to the owner. *Id.* at 16, 20. Housing assistance payments were calculated as the difference between the gross rent and a family's payable portion and were to be paid by HUD to the owner each month, following a request for payment from the owner which included a certification that the units were "in Decent, Safe, and Sanitary condition." *Id.* at 20, 22.

The contract contained the following provisions relating to assignments:

> (a) The Owner agrees that it has not made and will not make any sale, assignment, or conveyance or transfer in any fashion, of this Contract . . . or the project or any part of them or any of its interest in them, without the prior written consent of HUD . . . .
>
> (b) The Owner agrees to notify HUD . . . promptly of any proposed action covered by paragraph (a) of this section. The Owner further agrees to request the prior written consent of HUD . . . .

*Id.* at 34.[6] The contract also provided that it "shall continue in effect and housing assistance payments will continue in accordance with the terms of the Contract in the event . . . [o]f assignment, sale, or other disposition of the project or this Contract . . . ." *Id.*[7]

---

[4] The information contained in this background section was culled from the documents submitted by each party and is intended to provide a context for the motion under consideration. As these materials were not submitted in a manner suitable for summary judgment, the resulting information should not be considered factual findings of the Court.

[5] For the sake of convenience, the Court refers to the third attachment to plaintiff's supplemental memorandum (filed Feb. 9, 2007) as "Pl.'s App." The page numbering provided by the electronic filing system is used for citation purposes.

[6] Although it is not legible on the copy submitted, this appears to be section 2.20 of the HAP contract.

[7] This appears to be section 2.20(e)(1). *See supra* note 6.

In June 1998, Lakeview Gardens was purchased by Y/A.W.A.R.E. Programs, Inc. ("Y/A.W.A.R.E.") with HUD's approval, and the HAP contract was assigned to the purchaser. *Id.* at 8 (Schuster Decl. ¶ 3). The property failed to receive a satisfactory score on an October 18, 1998 inspection by HUD's Real Estate Assessment Center, "reflecting both the existence of exigent health and safety conditions and an overall failing grade." *Id.* Five days later, Y/A.W.A.R.E. purported to transfer Lakeview Gardens to Diversity Institute, Inc. *Id.* Solo Ventures, LLC -- described by the government as Y/A.W.A.R.E.'s mortgagor, *see* Def.'s Mot. at 3 -- responded with a state court lawsuit against Y/A.W.A.R.E. and Diversity Institute to prevent the transfer of Lakeview Gardens. *See* Def.'s App. at 38-42. On August 26, 1999, the state court appointed a receiver for the benefit of Solo Ventures, to escrow the funds generated by Lakeview Gardens. *Id.* at 38-39.[8] Shortly thereafter Frederick D. Harris, M.D., a member of Solo Ventures, *see id.* at 49-50, 53-54, 57, met with local HUD officials to discuss the Lakeview Gardens ownership dispute and the appointment of the receiver. Pl.'s App. at 12. Doctor Harris maintains that HUD verbally extended the HAP contract at this meeting. *Id.*

On September 9, 1999, the state court entered a default judgment in favor of Solo Ventures, voiding the transfer of Lakeview Gardens from Y/A.W.A.R.E. to Discovery Institute and imposing a $125,000 judgment lien on the property in the name of Solo Ventures. Def.'s App. at 40-42. The HAP contract expired on September 13, 1999. *See* Att. to Compl. at 1; Def.'s App. at 3.[9] On October 25, 1999, the receiver entered into a renewal contract with HUD retroactively extending the HAP contract for four months, through January 13, 2000. Att. to Compl. at 1-2; Def.'s App. at 3-4. On December 21, 1999, to settle the $125,000 money judgment and in lieu of foreclosure, Y/A.WA.R.E. conveyed Lakeview Gardens to Solo Ventures. Def.'s App. at 45-52. One paragraph in the conveyance agreement stated that the HAP contract "has expired in whole as of September 13, 1999 and is not subject to renewal with" Y/A.W.A.R.E. *Id.* at 47 (¶ 12). This paragraph continued: "Per HUD requirement, Grantor and Grantee agree to execute an Assignment of said contract for immediate submission to HUD along with a fully executed copy of this Agreement for HUD's review and approval." *Id.* Accordingly, a representative of Y/A.W.A.R.E. and Dr. Harris, acting for Solo Ventures, that same day executed an assignment of the HAP contract. *Id.* at 53. The assignment contains language stating, on the one hand, that it is "effective the date of transfer of the real estate owned by Assignor on Lakeview Road," and, on the other, that it "is subject to the written consent required by the United States Department of Housing and Urban Development and shall not be effective until such consent is given." *Id.*

---

[8] Although two individuals were appointed as receivers of the property, *see* Def.'s App. at 38, the Court will refer to "receiver" in the singular, as it does not appears that joint action by both individuals was required under the receivership.

[9] By the terms of the initial HAP contract, it appears that the contract would have expired on two separate dates concerning each group of twenty units covered in separate stages -- July 22, 1999 and September 13, 1999, respectively. *See* Def.'s App. at 11-12, 14.

Despite the language in the conveyance agreement, it does not appear that either the agreement or the assignment was immediately submitted to HUD. On January 12, 2000, with one day remaining under the HAP renewal contract, the Cleveland HUD office sent a facsimile to Solo Ventures' attorney concerning a direct deposit form signed by the receiver. This note stated that the signature by a receiver "is fine because the receiver is still acting in [sic] behalf of the owner because we have no evidence that Solo Ventures had been determined to be the owner." Pl.'s App. at 6. The note also indicated that the receiver's failure to provide a Taxpayer Identification Number ("TIN") on the form was a "problem," as "[n]o subsidy can begin to flow to the receiver until we have a TIN number for that receiver." *Id.*

Two days later, the director of the Cleveland HUD office addressed a letter to Steven Bradley, one of the court-appointed receivers, which began: "As the Receiver for Lakeview Gardens, you are being offered a 120 day renewal of the Housing Assistance Payments (HAP) Contract for that property." Att. to Compl. at 4; Def.'s App. at 6. The receiver was informed that copies of the renewal contract were being sent under separate cover and "should be signed and returned to the Cleveland HUD Office following your receipt." Att. to Compl. at 4; Def.'s App. at 6. The renewal "ha[d] an effective date of January 14, 2000," and HUD explained that "[d]uring this 120 day renewal period, the Cleveland Multifamily Program Center (Cleveland HUD Office) hopes to approve the new owner and management agent when we receive the proper information which permits us to identify those entities." Att. to Compl. at 4; Def.'s App. at 6. The receiver was again asked for a TIN, and was also asked to submit copies of documents detailing the responsibilities of the receiver. Att. to Compl. at 4-5; Def.'s App. at 6-7. On January 29, 2000, Solo Ventures sold the Lakeview Gardens property to Forest Glen, a newly-formed entity in which Dr. Harris was also a member. Def.'s App. at 56-57; Pl.'s App. at 8.[10]

Two weeks later, on February 11, 2000, counsel for Forest Glen and Solo Ventures submitted to the Cleveland HUD office a copy of the Ohio court order nullifying the transfer to Diversity Institute; the conveyance agreement transferring the property to Solo Ventures; the assignment of the HAP contract from Y/A.W.A.R.E. to Solo Ventures; copies of the warranty deeds transferring the property to Solo Ventures and to Forest Glen; and a notice that a HUD inspection of the property would occur on February 14, 2000. Def.'s App. at 60-61; Pl.'s App. at 7-8. The noticed inspection was conducted and although the resulting score of "26c*" was a marked improvement over the score of "8c*" tallied in October 1998, this was well below the passing grade of sixty. Def.'s App. at 62; *see also id.* at 8-9 (Schuster Decl. ¶¶ 3, 6).[11]

---

[10] *See also* Pl.'s App. at 12 (letter to HUD from Dr. Harris stating that he and Andrew Jackson were the members of Forest Glen); Att. 1 to Pl.'s Supp'l Mem. at 1 (Harris Aff. ¶ 1) (identifying Dr. Harris as the "managing member" of Forest Glen).

[11] The "c*" aspect of the rating appears to represent "exigent, health and safety findings." *See* Def.'s App. at 64.

On March 23, 2000, HUD addressed a letter to Y/A.W.A.R.E. (with copies to Forest Glen, the receiver, and Solo Ventures), informing it that the February inspection revealed "twenty-five exigent, health and safety findings" and that "[a]s a direct result, the subsidy contract for Lakeview Gardens will not be renewed." Def.'s App. at 62. Doctor Harris responded with a letter dated March 29, 2000, following up on a conversation he had earlier that day with the director of the Cleveland HUD office. Pl.'s App. at 12-14. The letter recounted the new ownership's efforts to repair and improve the property, which were made with the "understanding of a working relationship and contract," and Dr. Harris ultimately requested a new inspection, a meeting, and an additional extension of "our contract." *Id.* at 13. The letter also revealed some confusion between Dr. Harris and the HUD official concerning whether the receiver had signed a contract. *Id.*

The meeting request was satisfied on April 14, 2000, when Forest Glen, the receiver, and HUD officials from Cleveland and Chicago met for over three hours to discuss the property and the HAP contract. *See* Pl.'s App. at 20. At this meeting, HUD agreed to visit the property again "to determine whether the project met HUD's Physical Condition Standards and Inspection Requirements, 24 C.F.R. Part 5, Subpart G." Def.'s App. at 64. After this visit, HUD addressed a letter to counsel for Forest Glen and Solo Ventures dated May 10, 2000. In this letter, HUD acknowledged that "some improvements had been made to the project," but concluded that "the project clearly continues to fail to meet the decent, safe and sanitary conditions required by HUD." *Id.* After identifying several deficiencies discovered during the visit, HUD noted that "[t]hese deficiencies are material, have existed for many months, and constitute events of default of any [HAP] Contract with HUD; whether such HAP Contract is between HUD and the former project owner, or otherwise." *Id.*

The agency further determined that the plan proposed by Forest Glen was inadequate in light of the property's condition, and informed the plaintiff that "the HAP Contract for the project will not be assigned to the current owner and will not be renewed." *Id.* at 65.[12] The letter also suggested that HUD might not honor the contract renewal executed by the receiver, as HUD's "office has not yet received a court order declaring that the receiver had authority to sign the HAP Contract extension on behalf of the former owner." *Id.* In a June 16, 2000 letter to Forest Glen's counsel from HUD's Departmental Enforcement Center, however, HUD appeared to acknowledge that the receiver had the proper authority and stated that it "continues to diligently work with the Project's Receiver . . . to obtain all necessary information to process HAP payments for the period September 14, 1999, to January 14, 2000." Pl.'s App. at 20.

In its complaint filed September 16, 2005, Forest Glen alleges that it "was and remains Assignee" of a HAP contract entered between the government and the receiver, its assignor.

---

[12] A HUD official later explained that the reason for visiting the property after denying the contract renewal (in the letter of March 23, 2000) was the agency's preference for "another verification of condition before we . . . terminate a contract." Att. 2 to Pl.'s Supp'l Mem. at 8 (Schuster depo. tr. at 71).

Compl. at 1. Forest Glen also alleges that the receiver accepted the offer of a second renewal, and that plaintiff performed this contract from January 14, 2000 through April 14, 2000. *Id.* at 2. Plaintiff further alleged that it "continued to perform the same housing services" through June 30, 2000. After the government filed its motion to dismiss the case under RCFC 12(b)(1), Forest Glen sought to suspend consideration of the government's motion while it attempted to "formalize its 'assignee' status." *See* Pl.'s Mem. Contra Def.'s Mot. at 2. Apparently, the assignment had not previously been memorialized in writing, and the receivership had for several years been terminated. Rossi Aff. ¶¶ 4-5 (Jan. 23, 2007).[13] Plaintiff sought a stay while the receiver "attempt[ed] to reopen that receivership action for the sole purpose of obtaining that Court's authority to sign the Assignment." *Id.* ¶ 6.[14] The written assignment, seemingly drafted in September 2006, *see* Att. to *id.* at 1, was ultimately signed (but not dated) by both receivers and submitted with Forest Glen's supplemental memorandum on February 9, 2007. *See* Att. 1 to Pl.'s Supp'l Mem. at 2. The assignment reads: "For valuable consideration, the undersigned hereby transfer, set over and assign, to Forest Glen Properties, LLC, all of our right, title and interest in and to the attached Housing Assistance Payments Renewal Contract." *Id.* Attached to the assignment is a copy of the renewal contract which expired on January 13, 2000, and a copy of the HUD letter January 14, 2000, offering a second renewal. *Id.* at 3-7.

## II. DISCUSSION

The defendant contends that this case should be dismissed, under RCFC 12(b)(1), as a matter beyond our court's jurisdiction. According to the government, Forest Glen is not in privity with the United States and thus has no standing to prosecute a breach of contract claim against it. *See* Def.'s Mot. at 7 (citing *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998) and *Martinez v. United States*, 48 Fed. Cl. 851, 860 (2001)).[15] It bases this contention on the fact that the first renewal contract was executed by HUD and the receiver, not Forest Glen. Def.'s Mot. at 7; *see* Att. to Compl. at 1-2. The government further argues that the HAP contract "specifically conditioned the transfer of rights arising under the HAP contract upon the prior written approval of HUD." Def.'s Mot. at 8 (citing Def.'s App. at 34). Instead of

---

[13] This affidavit was initially filed with plaintiff's memorandum on January 17, 2007, but due to technical problems the draft assignment referenced in the affidavit was not attached.

[14] Plaintiff's motion to suspend action on the government's dispositive motion was rendered moot once the Court granted its subsequent motion for leave to file a supplemental memorandum opposing the motion to dismiss. *See* Order (June 14, 2007) at 3.

[15] Although the government describes the alleged jurisdictional defect as a lack of "standing" in only one place in its papers relating to the pending motion, *see* Def.'s Opp. to Pl.'s Mot. for Leave to File Supp'l Mem. at 2, the absence of privity of contract is a matter of standing. *See, e.g.*, *Erickson Air Crane Co. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984); *Fairchild Inds., Inc. v. United States*, 223 Ct. Cl. 315, 320 (1980).

approving the assignment of the HAP contract, the government maintains that HUD, to the contrary, refused to allow the assignment due to the substandard condition of the subject property. *Id.* (citing Def.'s App. at 9 (Schuster Decl.), 64-65 (May 10, 2000 HUD letter)). And regarding the second renewal, the government argues that no evidence supports the actual acceptance of the offer to renew, and that "the manner in which acceptance was invited" was "by returning an executed copy of a renewal contract." *Id.* (citing Def.'s App. at 9 (Schuster Decl. ¶ 5, stating project file does not have a copy of second renewal contract received from the receiver).

In its initial response, plaintiff argued that it was inappropriate for the government to base an RCFC 12(b) motion on anything other than the pleadings. *See* Pl.'s Mem. Contra Def.'s Mot. at 1 (citing *Blue Dot Energy Co. v. United States*, 61 Fed. Cl. 548 (2004)). Forest Glen contended that the motion was therefore procedurally defective, and also suggested that the matter was instead appropriate for summary judgment -- which it then sought to forestall via an RCFC 56(f) affidavit. *See id.* at 1-2. This affidavit, as noted above, stated that the receivership had been terminated for several years and needed to be reopened so that the receiver could sign a written assignment of the HAP renewal contract. Rossi Aff. ¶¶ 5-6. Plaintiff's counsel stated that Forest Glen could not oppose summary judgment until the assignment was signed and attached to an affidavit of Dr. Harris. *Id.* ¶ 8.

After the government pointed out that a motion to dismiss due to the lack of subject matter jurisdiction may be based on outside evidence, *see* Def.'s Reply at 1 (citing *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747-48 (Fed. Cir. 1988), and *Englewood Terrace Ltd. P'ship v. United States*, 61 Fed. Cl. 583, 584 (2004)), Forest Glen submitted a supplemental memorandum. The memorandum was accompanied by an affidavit of Dr. Harris to which was attached a copy of the written assignment, *see* Att. 1 to Pl.'s Supp'l Mem.; by excerpts from the deposition of a HUD official, *see* Att. 2 to Pl.'s Supp'l Mem.; and by copies of correspondence and other documents regarding the HAP contract and the apartment complex. *See* Pl.'s App. In its supplemental memorandum, Forest Glen argues that it is the real party in interest by virtue of the assignment of the HAP renewal contact. Pl.'s Supp'l Mem. at 2. It also contends that an implied-in-fact contract extended the HAP contact for the second renewal period. *Id.* at 1-2. Forest Glen also maintains that HUD's interpretation of the HAP contract as requiring prior written consent of any assignments was inconsistent with HUD's dealings with the receiver and HUD's dealings with counsel representing both Solo Ventures and Forest Glen. *See id.* at 2-4. Plaintiff argues that as a consequence of HUD's actions, the government waived its ability to enforce the prior written consent clause. *Id.* at 3-4.

The Court gave defendant the opportunity to reply to plaintiff's supplemental memorandum. Order (June 14, 2007) at 3. In its supplemental reply, the government argues that the submitted documentary evidence shows that HUD invoked its contractual right to deny consent to the assignment of the project's HAP contract in a letter dated May 10, 2000. Def.'s

Supp'l Reply at 1.[16] The government also highlights the January 14, 2000 letter from HUD to the receiver, a copy of which was apparently sent to counsel for Solo Ventures and Forest Glen, *see* Def.'s App. at 7, as communicating the need for HUD approval of any transfer of the contract. Def.'s Supp'l Reply at 1-2. Defendant maintains that HUD considered approving the assignment of the HAP contract until a second visit to the property, conducted by HUD on April 26, 2000, confirmed its poor condition. *Id.* at 2 (citing Def.'s App. at 64-65). The government concludes that no assignment could have occurred because HUD consent had never been granted. *Id.*

**A. Procedure for Determining Jurisdictional Facts**

Before addressing the substance of the government's motion, a brief discussion of procedure is in order. The parties appear to be somewhat confused about the manner in which a challenge to jurisdictional facts is considered. Forest Glen mistakenly believes that RCFC 12(b)(1) motions cannot be based on matters outside its pleading. *See* Pl.'s Mem. Contra Def.'s Mot. at 1. The government, for its part, misunderstands RCFC 12(b) as allowing the conversion of a motion to dismiss for lack of subject matter jurisdiction into one for summary judgment. *See* Def.'s Reply at 1-2.

The confusion of the parties, to be sure, is no doubt fostered by our court's rules (and the Federal Rules of Civil Procedure ("FRCP"), which are their inspiration). Although the question is not raised infrequently, the rules are silent on the procedure to be followed when a party challenges jurisdictional facts. Motions to dismiss, including those based on a lack of subject matter jurisdiction, are typically based on the pleadings, in which case the court accepts as true all of the non-movant's factual allegations and draws all reasonable inferences in a light most favorable to that party. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988); *see also Pixton v. B&B Plastics, Inc.*, 291 F.3d 1324, 1326 (Fed. Cir. 2002) (explaining that court must "view the alleged facts in the complaint as true, and if the facts reveal any reasonable basis upon which the non-movant may prevail, dismissal is inappropriate"). But this approach applies only when a complaint's jurisdictional allegations are unchallenged.[17] *See Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed. Cir. 1989); *Reynolds*, 846 F.2d at 747. When evidence is submitted challenging jurisdictional facts, a court, under its obligation to determine whether it has jurisdiction, *see* RCFC 12(h)(3), may consider this evidence. *See*, *e.g.*, *KVOS, Inc. v. Associated Press*, 299 U.S.

---

[16] The government provided the inaccurate date of May *16*, 2000 for this letter. *See* Def.'s Supp'l Reply at 1. While the date stamped on the letter is not entirely clear, *see* Def.'s App. at 64, the government had previously stated that it was May 10, 2000, Def.'s Mot. at 5, and a subsequent letter from HUD also used the May 10th date for reference. *See* Pl.'s App. at 20.

[17] Another exception, not applicable here, is when a complaint's allegations are so frivolous that subject matter jurisdiction is found lacking. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998); *Hagans v. Lavine*, 415 U.S. 528, 536-38 (1974); *Bell v. Hood*, 327 U.S. 678, 682-83 (1946).

269, 278 (1936) (explaining that the movant "recited facts dehors the complaint"); *Land v. Dollar*, 330 U.S. 731, 735 & n.4 (1947); *Moyer v. United States*, 190 F.3d 1314, 1318 (Fed. Cir. 1999); *Reynolds*, 846 F.2d at 747; *Englewood Terrace Ltd. P'ship v. United States*, 61 Fed. Cl. 583, 584 (2004); *cf. Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1580, 1583-84 (Fed. Cir. 1993) (applying law of the Ninth Circuit but relying in part on Supreme Court precedent).

But reliance on evidence does not change the nature of the motion from one concerning dismissal to one concerning summary judgment, as the latter category is reserved for determinations of the *merits* of a case. *See Vink v. Schijf*, 839 F.2d 676, 677 (Fed. Cir. 1988). A motion to dismiss for failure to state a claim upon which relief may be granted -- which is a merits determination, *see*, *e.g.*, *Spruill v. Merit Sys. Prot. Bd.*, 978 F.2d 679, 686 (Fed. Cir. 1992); *Do-Well Mach. Shop, Inc. v. United States*, 870 F.2d 637, 639 (Fed. Cir. 1989) -- must, under our court's rules, be converted to one for summary judgment when outside evidence is considered, and summary judgment procedures are accordingly followed. *See* RCFC 12(b). No similar treatment is provided for motions to dismiss for lack of subject matter jurisdiction even though these, too, may be based on outside evidence -- perhaps because these motions are not merits determinations and thus do not result in the type of preclusive "judgment" covered by RCFC 56.

Clearly, though, when motions to dismiss for lack of subject matter jurisdiction challenge jurisdictional facts, a court must initially approach the factual issues as it would pursuant to a summary judgment motion. *Cf. Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (explaining how challenges to jurisdictional facts may be considered at "the summary judgment stage" of a case). Unlike, say, the determination of a bid protest, *see* 28 U.S.C. § 1491(b)(4), the question of jurisdiction is not one that is confined to some pre-packaged record within which our court must find the facts, using the process now located at RCFC 52.1.[18] *Cf. Bannum, Inc. v. United States*, 404 F.3d 1346, 1355-57 (Fed. Cir. 2005) (explaining the legal standard governing judgment on the administrative record); *Arch Chems., Inc. v. United States*, 64 Fed. Cl. 380, 388 (2005) (same). Thus, when the government submits affidavits and evidence in support of its RCFC 12(b)(1) motion, our court is not confined to these materials in ruling on the motion, but must provide the plaintiff with the opportunity to submit all available evidence supporting its jurisdictional allegations. *Hamlet*, 873 F.2d at 1417; *Reynolds*, 846 F.2d at 748; *cf. Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 203 n.19 (1974) (holding that summary judgment procedures could properly be used by a trial court to determine jurisdictional facts when there was "no indication" that the party invoking the court's jurisdiction "was foreclosed from presenting all available evidence concerning the [jurisdictional] issues").

---

[18] As the Court has frequently observed, the Supreme Court's determination that the Administrative Procedure Act usually requires the review of an administrative record rather than a trial de novo when informal agency decisions are challenged is based on a misreading of legislative history. *See*, *e.g.*, *Gulf Group Inc. v. United States*, 61 Fed. Cl. 338, 350 n.25 (2004); *Fort Carson Support Svcs. v. United States*, 71 Fed. Cl. 571, 585 (2006); *Beta Analytics Int'l, Inc. v. United States*, 67 Fed. Cl. 384, 394 (2005).

Were this an RCFC 56 summary judgment motion, it would possess two procedural characteristics that differ significantly from an RCFC 12(b)(1) motion. First, the moving party would have submitted "Proposed Findings of Uncontroverted Fact," to which the opposing party would have responded. *See* RCFC 56(h)(1)-(2).[19] These documents provide a framework for -- as well as notice of -- the facts that each side believes can be established, tying each fact to some evidentiary support. *See id.* The Court has the discretion, of course, to order the parties to submit such documents in the absence of a formal rule, and would do so here were it deemed necessary to determine the pending motion. But the failure of our court's rules, and the FRCP, to require a similar document when jurisdictional facts are challenged is both inefficient and inexplicable.[20]

The other significant procedural difference between a Rule 12(b)(1) motion and one for summary judgment is that under the latter, the function of the Court would be to determine whether there is a "genuine issue as to any material fact." RCFC 56(c). The summary judgment motion would fail if the nonmoving party could demonstrate a genuine dispute over a material fact, and to do this the party need not "produce evidence in a form that would be admissible at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The moving party, however, must file with the court the documentary evidence, such as exhibits or affidavits, that support its assertions that material facts are beyond genuine dispute, *see* RCFC 56(h)(1), unless it is basing its motion for summary judgment on the "absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325; *see also Anchor Sav. Bank v. United States*, 59 Fed. Cl. 126, 140 (2003). Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over facts is genuine "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Id.*; *see also Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed. Cir. 1987).

If, despite drawing all reasonable inferences in favor of the nonmoving party, *see Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987), the Court were to find that material facts are not genuinely disputed and that these facts establish a lack of subject matter jurisdiction, the moving party would prevail on an RCFC 12(b)(1) motion just as it would on an RCFC 56 motion -- the only difference being that, instead of receiving a judgment, the movant would succeed in having the case dismissed. *See*, *e.g.*, *KVOS*, 299 U.S. at 278-80 (holding that case should be dismissed when plaintiff failed to offer evidence supporting jurisdictional allegations); *Rocovich v. United States*, 933 F.2d 991, 994-95 (Fed. Cir. 1991)

---

[19] Assuming, that is, that the parties were unable to stipulate to the material facts. *See* RCFC 56(h)(3) (allowing the filing of "a comprehensive stipulation of all of the material facts" in lieu of the proposed findings and response).

[20] The problematic lack of formal procedures for determining jurisdictional facts has long been recognized by the courts. *See*, *e.g.*, *Land*, 330 U.S. at 735 n.4; *Gibbs v. Buck*, 307 U.S. 66, 71-72 (1939); *Wetmore v. Rymer*, 169 U.S. 115, 120-21 (1898).

(same). The wrinkle surfaces when the Court finds a genuine issue as to a material fact. In the context of summary judgment, this suffices to defeat the motion. *See Liberty Lobby*, 477 U.S. at 248-49; *Mingus Constructors*, 812 F.2d at 1390. But the matter is more complicated when subject matter jurisdiction is at issue, because "federal courts have the power, and the duty, to determine their own jurisdiction." *Williams v. Sec'y of the Navy*, 787 F.2d 552, 557 (Fed. Cir. 1986). And, as the Supreme Court has often recognized, "the first and fundamental question is that of jurisdiction." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Great S. Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 453 (1900)); *Mansfield, Coldwater & Lake Mich. Ry. Co. v. Swan*, 111 U.S. 379, 382 (1884). Any serious issue as to a court's jurisdiction must be resolved before that court can render a judgment on the merits. *See Steel Co.*, 523 U.S. at 93-102 (rejecting the resolution of merits questions under assumed or "hypothetical jurisdiction").

Thus, a plaintiff which is able to demonstrate the existence of a genuine issue concerning jurisdiction over the subject matter of its own case can hardly take comfort in this state of affairs. In that circumstance, the movant has succeeded in raising a serious doubt as to the court's subject matter jurisdiction. The party invoking a court's jurisdiction bears the burden of establishing it, and must ultimately do so by a preponderance of the evidence. *See McNutt v. GMAC*, 298 U.S. 178, 189 (1936); *Reynolds*, 846 F.2d at 748; *Rocovich*, 933 F.2d at 993. The question in dispute, then, is not only one which must be carried by the plaintiff, but is "the first and fundamental question" for a court, *see Steel Co.*, 523 U.S. at 94 -- which has the discretion to insist that the question be resolved through a fact-finding hearing before proceeding any further. *See McNutt*, 298 U.S. at 189. When it appears to a court, however, that the jurisdictional facts are "inextricably intertwined with the merits," it may postpone their determination until trial when all relevant evidence may be considered at the same proceeding. *Beuré-Co. v. United States*, 16 Cl. Ct. 42, 52-53 (1988); *see*, *e.g.*, *Land*, 330 U.S. at 735-39; *Kawa v. United States*, 77 Fed. Cl. 294, 304 n.4 (2007).

**B. Disputed Facts and Unaddressed Questions of Law**

Turning to the substance of the government's motion, its major premise is that Forest Glen was never assigned a HAP contract and thus is not in privity with the United States. The government argues that any HAP renewal contracts between HUD and the receiver could not be assigned to plaintiff without HUD's prior written consent, under a clause of the original HAP contract. Def.'s Mot. at 7-8. It then cites a May 10, 2000 letter as evidence that consent was denied. *Id.* at 8 (citing Def.'s App. at 64-65); Def.'s Supp'l Reply at 1-2 (same).

Contract interpretation is a question of law. *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1292 (Fed. Cir. 2002); *Cal. Fed. Bank v. United States*, 245 F.3d 1342, 1346 (Fed. Cir. 2001); *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1544 (Fed. Cir. 1993); *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed. Cir. 1985). A contract's terms may, however, be ambiguous, necessitating a review of extrinsic evidence to determine the parties' intent. *See generally Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 747-49 (2005) (discussing

the principles governing contract interpretation). The particular clause upon which the government relies was apparently incorporated by reference into the renewal of the HAP contract executed by the receiver on October 25, 1999. The HAP renewal contract expressly stated that *all* terms of the original HAP contract -- other than those pertaining to rent amounts, which were instead governed by an attached exhibit -- were renewed. Att. to Compl. at 1 (cl. 2); Def.'s App. at 3.

Looking closely at the provision cited by the government, the Court discerns two basic problems with this ground for the government's motion to dismiss. First, by explicitly substituting the receiver in place of the property owner as the second party to the renewal contract, the government appears to have, at best, created an ambiguity concerning the application of this provision -- and perhaps rendered it unintelligible. Second, the provision in question, by its plain language, does not *condition* assignments upon the prior written consent of HUD -- assignments made without consent are not ineffective or invalid, but instead constitute a breach of the owner's promise not to do so. Associated with these two problems with the government's interpretation of the provision are a number of disputed material facts, as well as a number of questions of law that the parties have not addressed.

*1. The Receiver as a Party to the Renewal Contract*

In the relevant provision of the original HAP contract, the "Owner" promises it "will not make any sale, assignment, or conveyance or transfer in any fashion, of this Contract . . . or the project or any part of them or any of its interest in them, without the prior written consent of HUD . . . ." Def.'s App. at 34. The first page of each part of that contract expressly identified the "Owner" as Lakeview Gardens, Ltd., *see id.* at 10, 19, and the contract was executed on behalf of that owner. *Id.* at 14. The HAP renewal contract describes the second party to that agreement as "STEVEN L. BRADLEY, the court appointed Receiver: Per Case #372525 (dated August 26, 1999) (copy attached)," with the handwritten insertion of the name of Mark Marein, the second individual appointed as receiver. Att. to Compl. at 1; Def.'s App. at 3; *see generally* Def.'s App. at 38 (state court order appointing Messrs. Marein and Bradley as receivers). Unlike the expiring HAP contract, the designation "Owner" does not appear immediately after this party identification. *Compare* Def.'s App. at 3 *with id.* at 10. Nevertheless, the HAP renewal contract uses the term "Owner" throughout, apparently as a synonym for the second (that is, the non-HUD) party to the contract. *See* Att. to Compl. at 1-2; Def.'s App. at 3-4.

The HAP renewal contract also, however, specifically describes "the Owner" as the party which previously entered into the expiring HAP contract, and above the signature block identifies the "Owner" as Lakeview Gardens, Ltd. Att. to Compl. at 1-2; Def.'s App. at 3-4. This is problematic, and puzzling, as the government acknowledges that Lakeview Gardens, Ltd. -- with HUD's approval -- sold the property and assigned the HAP contract to Y/A.W.A.R.E. back in June 1998. Def.'s App. at 8 (Schuster Decl. ¶ 3). The receiver who executed the HAP renewal contract could not possibly have been acting on behalf of Lakeview Gardens, Ltd., which was out of the picture some fourteen months before he was appointed by the state court. Clearly,

the reference to Lakeview Gardens, Ltd. was a mistake, as it could not have been the "Owner" for purposes of the HAP renewal contract.[21]

So who, then, was the "Owner"? Did the parties intend that the receiver be considered the "Owner," or instead a party representing the "Owner"? The receiver was appointed at the request of Solo Ventures, a creditor of Y/A.W.A.R.E. which was alarmed by Y/A.W.A.R.E.'s attempted transfer of the Lakeview Gardens property to Diversity Institute. *See id.* at 38-42. The Ohio court authorized the receiver "to establish and maintain escrow of any and all funds related to Lakeview Gardens from whatever source derived pending the disposition" of the case brought by Solo Ventures, *id.* at 39, and to use "all powers necessary to carry out such escrow as permitted under Ohio Revised Code 2735.04." *Id.* at 38. The referenced Ohio statute provides that "a receiver may bring and defend actions in his own name as receiver, take and keep possession of property, receive rents, collect, compound for, and compromise demands, make transfers, and generally do such acts respecting the property as the court authorizes." OHIO REV. CODE ANN. § 2735.04 (2007).

The receiver was thus empowered to act as if he were the owner of Lakeview Gardens, and was appointed to collect rent payments while the state court determined whether Diversity Institute or Y/A.W.A.R.E. should receive them. And when appointed in these circumstances, a receiver exercises the rights not just of the property owner/debtor but also the creditor who applied for the receivership, and in addition has his own interest in the property. *See McGinness v. United States*, 90 F.3d 143, 146-47 (6th Cir. 1996). The state court proceeding resulted in a lien on the Lakeview Gardens property in favor of Solo Ventures. Def.'s App. at 42. This lien was declared on September 9, 1999 -- four days before the original HAP contract expired and over six weeks before the HAP renewal contract was executed. *See id.*

Among the documents submitted by plaintiff to oppose the motion to dismiss is a letter from Forest Glen to HUD in which Dr. Harris -- the managing member of Forest Glen, *see* Att. 1 to Pl.'s Supp'l Mem. at 1 (Harris Aff. ¶ 1) -- describes an August 1999 meeting. Pl.'s App. at 12. It is reasonable to construe this account to reflect testimony which Dr. Harris would give in this proceeding, should it go to trial. Doctor Harris maintains that at the meeting, he informed HUD of the "ownership dispute" over Lakeview Gardens and of the state court's appointment of the receiver, and received "a verbal extension for a contract." *Id.* From this, one could conclude that HUD understood the receiver to be acting for Dr. Harris's Solo Ventures, whether due to the latter's status as a creditor or as a prospective owner.[22] In any event, HUD renewed the HAP

---

[21] Forest Glen adds to the confusion by identifying Lakeview Gardens, Ltd., as one of the entities for which the receiver acted. Compl. at 1.

[22] Under this interpretation of the HAP renewal contract, another set of questions arise. For example, could Solo Ventures and Forest Glen be considered alter egos due to Dr. Harris's roles as the primary member of both entities? Or was the passing of Lakeview Gardens from Solo Ventures to Forest Glen the result of a reorganization? *Cf. Seaboard Air Line Ry. v. United*

contract with the receiver, whose very existence indicated indeterminate ownership of the Lakeview Gardens property. It is hard to square the HAP contract language, by which the "Owner" promises to obtain HUD's consent before assigning the contract, with the fact that HUD appeared indifferent to the property owner's identity when the HAP renewal contract was executed. Indeed, since the whole point of the receivership was to collect rents for the benefit of parties other than the receiver himself, one could construe HUD's decision to enter into a HAP renewal contract with the receiver as its written consent to the contract's assignment to whomever may come to own the property during the receivership's existence.[23]

Otherwise, it is far from clear how the HUD consent provision would apply, if "Owner" were to mean the receiver by virtue of the HAP renewal contract. When property comes under the control of a receiver or a trustee by operation of law, this event is not normally considered an assignment -- for purposes of the Anti-Assignment Act, for instance. *See*, *e.g.*, *Nat'l Bank of Commerce v. Downie*, 218 U.S. 345, 356-57 (1910); *Bailey v. United States*, 78 Fed. Cl. 239, 265-67 (2007). If the passing of the interest *to* a receiver would not be a transfer in ownership, it is questionable that its passing *from* a receiver would be, either. Would this mean, then, that while the contract remains in force, whatever entity were to own the property at the time the receivership terminated would automatically assume the role of "Owner," but subsequent transferees would be subject to the consent provision?

The matter is further complicated by the allegation that the receivership terminated "several years ago," Rossi Aff. ¶ 5, and may not have existed when the lawsuit was filed. Plaintiff contends that, as owner of the property formerly known as Lakeview Gardens, it became the real party in interest entitled to money owed the receiver, including any amounts due under the HAP renewal contract. *See* Pl.'s Supp'l Mem. at 2; *see also* Def.'s App. at 56-57 (warranty deed granting property to Forest Glen). Due presumably to its interpretation of the HUD consent provision of the HAP contract, the government does not address this argument. It is not readily apparent to the Court why this lawsuit would need to be prosecuted in the name of the receiver, rather than the party for whose benefit the lawsuit has been brought, particularly if the receivership were already terminated.[24]

---

*States*, 256 U.S. 655, 657 (1921) (holding corporate mergers and consolidations do not come within the reach of the Anti-Assignment Act).

[23] It is certainly not to HUD's credit that on May 10, 2000, nearly four months after receiving the benefits of the HAP renewal contract, the agency implied that it was withholding payments due to its suspicion that the receiver lacked authority to renew the HAP contract. *See* Def.'s App. at 65; Pl.'s App. at 17.

[24] If the former were the case, there also does not appear to be any impediment to joinder or substitution of the receiver as plaintiff under RCFC 17(a), provided the receivership is or remains reopened.

In any event, the foregoing discussion demonstrates that to interpret the HAP contract provision upon which the government's lack of privity argument rests, the Court will need to consider evidence of the parties' intentions. But the facts that will tend to establish the obligations of the parties to the HAP renewal contract are inextricably intertwined with the merits of this case, as they will also be relevant to whether a breach has occurred. Thus, the Court concludes that a special evidentiary hearing on this question is not warranted prior to a merits proceeding.[25] *See Beuré-Co.*, 16 Cl. Ct. at 52-53; *Kawa*, 77 Fed. Cl. at 304 n.4.

*2. The Promise to Obtain Prior Written Consent*

The receiver appears to have signed the HAP renewal contract either as the representative of any party which would come to own the underlying property, or as the "Owner" himself. Plaintiff alleges that the receiver assigned it the HAP renewal contract, and an implied-in-fact renewal contract. *See* Compl. As was discussed above, this might simply mean that since Forest Glen became the owner of the apartment complex while the receiver still existed to collect rent payments, the rent payments by operation of law came automatically to be assigned to plaintiff. This will depend on aspects of the law of receivership that have not yet been briefed, and facts concerning the management of the subject property that are not yet before the Court.

But even if the "Owner," as a consequence of the execution of the HAP renewal contract by the receiver, is understood to be a party separate and distinct from the plaintiff and embodied in the receiver, the government would still not prevail on its motion to dismiss. It argues that the provision in question prevents the assignment of a HAP contract without HUD's consent. Def.'s Mot. at 8 (citing Def.'s App. at 34); Def.'s Reply at 2. As the government interprets it, "the HAP contract that was the subject of the initial renewal contract specifically conditioned the transfer of rights arising under the HAP contract upon the prior written consent of HUD." Def.'s Mot. at 8. Based on this interpretation, one would expect the provision to read something like, "no assignment may be made of this contract without the prior written consent of HUD."

Instead, the plain language of the provision recognizes the power of the "Owner" to assign the contract,[26] and reflects only the *promise* not to assign without first receiving HUD's written consent: "The Owner agrees that it . . . will not make any sale, assignment, or conveyance or transfer in any fashion, of this Contract . . . or the project or any part of them or any of its interest in them, without the prior written consent of HUD . . . ." Def.'s App. at 34. If the

---

[25] The government had previously indicated, in the joint status report filed October 5, 2006, that the pending motion would be one for summary judgment. Since the government did not use this opportunity to move for summary judgment, and instead filed only a motion to dismiss for lack of subject matter jurisdiction, the Court assumes that the ensuing merits proceeding will be a trial, and not a summary judgment hearing.

[26] Perhaps this explains why the government makes no mention of the Anti-Assignment Act, 31 U.S.C. § 3727 and 41 U.S.C. § 15, in its papers.

"Owner" had assigned the contract without first obtaining HUD's written consent, this violation of a contractual obligation would not change the fact that the assignment occurred; rather, it would constitute a default entitling HUD to exercise certain contractual rights. *See* Def.'s App. at 35-37 (HAP Contract § 2.21) (detailing HUD's rights in the event of a default, including the right to apply for the appointment of a receiver).[27]

To support its interpretation of the provision as placing a precondition on the ability to assign the HAP contract, the government cites language in the document through which Y/A.W.A.R.E. attempted to transfer the expired contract to Solo Ventures. *See* Def.'s Mot. at 8. This purported assignment stated that it "is subject to the written consent required by [HUD] and shall not be effective until such consent is given." Def.'s App. at 53. Neither party to this purported assignment was a signatory to the original HAP contract, nor to the HAP renewal contract, so their interpretation of the contract's provisions may be discounted. Casting further doubt upon their understanding is the fact that this document, as well as the accompanying property conveyance agreement, appears to be based on ignorance of the HAP renewal contract that was executed two months prior. *See* Def.'s App. at 47 (paragraph 12 of the conveyance agreement stating that the HAP contract "has expired in whole as of September 13, 1999 and is not subject to renewal with [Y/A.W.A.R.E.]"); *id.* at 53 (purported assignment making no mention of the HAP renewal contract, and describing the subject HAP contract as being dated July 23, 1984). This purported assignment is also internally inconsistent, as it contains two separate effective dates: "the date of transfer of the real estate" and the date when consent is given by HUD. *Id.* at 53.[28]

Moreover, the interpretation of the HUD consent provision that is reflected in this purported assignment, and in the draft consent form that was submitted to HUD with the assignment, is at odds with the language of the provision in another respect: The HAP contract provision by its plain language covers transfers of the underlying property or "project" as well as of the contract, *see id.* at 34, while the agreement conveying the property to Solo Ventures does not indicate the need for HUD consent, *see id.* at 45-49, and the draft consent form that was submitted to HUD concerns only the HAP contract. *See id.* at 55. In any event, unless Solo Ventures is found to be the same entity as Forest Glen, it is hard to see the relevance of *its* interpretation of any language.[29] The government confuses the conveyance of the property with the assignment of the HAP contract, and thus states throughout its papers that the assignor of the contract to plaintiff was Solo Ventures. *See* Def.'s Mot. at 8; Def.'s Reply at 2; Def.'s Supp'l

---

[27] It does not appear that any of these rights were expressly exercised, and the government did not state the affirmative defense of prior material breach in its answer.

[28] The seeming paradox of prior written consent given after-the-fact is perhaps explained by HUD's apparent practice of executing retroactive agreements, discussed briefly below.

[29] And nothing would appear to make Y/A.W.A.R.E.'s interpretations relevant.

Reply at 1-2. But Forest Glen has plainly alleged that its assignor was *the receiver*, not Solo Ventures. *See* Compl. at 1.[30]

Forest Glen, to be sure, has not shown that undisputed facts prove that the HAP renewal contracts were assigned to it by the receiver prior to the filing of this lawsuit -- the relevant date for purposes of jurisdictional determinations. *See Keene Corp. v. United States*, 508 U.S. 200, 207 (1993). But the government's motion, as framed, did not require it to do so. Rather than challenge the fact of an assignment, the motion rested on the absence of HUD's prior written consent. To support its allegation that the receiver assigned it the two renewal contracts, Forest Glen has submitted a written assignment that was recently executed by Messrs. Bradley and Marein. Att. 1 to Pl.'s Supp'l Mem. at 2. Although the language used in this assignment suggests that the HAP contract had not previously been assigned to the plaintiff, one could reasonably infer that this document was intended to "formalize" an assignment which had already been made. *See* Pl.'s Mem. Contra Def.'s Mot. at 2. It remains to be seen whether Forest Glen can prove that the assignment occurred -- perhaps orally or through actions such as the transfer of rent payments from the receiver's bank account to the plaintiff's. And as with the issue of the meaning of "Owner" under the renewal contract, the Court finds this matter too intertwined with the merits to be considered separately.

*3. The Implied-in-Fact Renewal Contract*

A minor premise of the government's motion, which the Court will treat briefly, is its argument that the offer of a second renewal was never accepted. It bases this contention on the fact that a second HAP renewal contract, executed by the receiver, cannot be found in HUD's files. Def.'s Mot. at 8 (citing Def.'s App. at 9). But while the letter offering the receiver a second 120-day renewal indicated that hard copies of a written contract were being separately sent and "should be signed and returned," the letter does not state that this is the only manner in which acceptance may be signified. *See* Att. to Compl. at 4; Def.'s App. at 6. Forest Glen alleges that the offer of a second renewal was accepted and that the resulting contract was performed, Compl. at 2, and argues that the contract was implied in fact. Pl.'s Supp'l Mem. at 1-2 & n.2.

The question of whether a contract exists is a mixed question of fact and law. *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998) (citing *Ransom v. United States*, 900 F.2d 242, 244 (Fed. Cir. 1990)). The elements of an implied-in-fact contract are the same as those of an express contract -- namely an offer, acceptance, consideration, possession of the requisite authority by the government actor, and a mutual intent to contract. *See Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325-26 (Fed. Cir. 1997); *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990); *Brunner v. United States*, 70 Fed. Cl. 623, 626-27 (2006). The Court notes that recent persuasive authority from our court has found that the

---

[30] The government has not challenged the sufficiency of these allegations under RCFC 9(h)(5).

allegation of the existence of an implied-in-fact contract suffices for purposes of establishing subject matter jurisdiction, and that any infirmity of proof of such contract presents a merits question. *Kawa*, 77 Fed. Cl. at 303-04 & n.4 (relying on dictum from *Spruill*, 978 F.2d at 689).

In either event, the result is the same in this matter -- as reasonable inferences drawn in Forest Glen's favor support the existence of an implied-in-fact contract, and the factual questions are "necessarily intertwined" with the merits, warranting a denial of the motion. *See Kawa*, 77 Fed. Cl. at 304 n.4. Two days before the second renewal offer was sent, a HUD official indicated that the receiver could still act for the owner of the property, despite HUD's apparent knowledge that Solo Ventures was the current owner. Pl.'s App. at 6. The letter offering the renewal explained that "[d]uring this 120 day renewal period," it would evaluate the new owner for purposes of deciding whether to further extend the HAP contract or instead "issue vouchers" directly to the residents. Att. to Compl. at 4-5; Def.'s App. at 6-7. After HUD was informed that plaintiff was the new owner of the property, *see* Def.'s App. at 60-61, Pl.'s App. at 7-8, HUD inspected the property, and the following month issued a letter announcing, in prospective language, that "the subsidy contract for Lakeview Gardens *will not be renewed*." Def.'s App. at 62 (emphasis added).

Forest Glen's response indicated that it was still waiting to receive HUD's share of the rent under what it understood to be an existing contract, and that it had just that day been informed by HUD that a contract might not have been signed by the receiver. Pl.'s App. at 13. After a meeting with Forest Glen, HUD visited the property a second time -- its preferred procedure when terminating a contract. *See* Att. 2 to Pl.'s Supp'l Mem. at 8 (Schuster depo. tr. at 71). The agency followed with a letter dated May 10, 2000 -- which was 118 days after the 120-day renewal contract was to begin. In this letter, HUD stated that the property's deficiencies "constitute events of default of any [HAP] Contract with HUD; whether such HAP Contract is between HUD and the former project owner, or otherwise." Def.'s App. at 64; Pl.'s App. at 16. The letter concluded that "the HAP Contract for the project will not be assigned to the current owner and will not be renewed," and the process for giving vouchers to tenants was discussed. Def.'s App. at 65; Pl.'s App. at 17.

The foregoing evidence is certainly consistent with, and can be read to support, the notion that a HAP renewal contract was in existence from the date of the offer through May 10, 2000. The record, such as it is, can reasonably be construed to rest on the recognition that during this period there existed a HAP renewal contract which HUD could have further renewed, could have approved the assignment of, and could have found in default or terminated, and under which HUD could have substituted vouchers in place of rent subsidies. While the inspection results could well have been grounds to not renew the HAP contract a third time, and perhaps to cease subsidy payments prospectively, nothing suggests that the *second* renewal offer was contingent upon them.[31] And during this time period, it does not appear even to be disputed that eligible

---

[31] The Court notes that HUD entered into the October 1999 HAP renewal contract, and offered the second renewal in January 2000, despite the failing grade received in the October 18,

residents were paying reduced rates to plaintiff under the terms of the HAP contract -- in other words, that plaintiff was performing the contract. From this evidence the Court may infer "conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding" that a contract had been made. *Balt. & Ohio R.R. Co. v. United States*, 261 U.S. 592, 597 (1923).[32]

These inferences are further bolstered by consideration of one peculiar course of conduct that HUD has followed regarding the subject HAP contract: It seems that every single executed contract relating to this property was *retroactive* in effect. The first stage of the original contract was effective July 23, 1984, but executed on November 27 and 28, 1984. Def.'s App. at 14. The second stage, effective September 14, 1984, was executed February 4, 1985. *Id.* And the HAP renewal contract, executed on October 25, 1999 was, as we have seen, effective September 14, 1999. Att. to Compl. at 1-2; Def.'s App. at 3-4. It is certainly more reasonable to assume that these agreements were initially performed as implied-in-fact contracts and later memorialized in express contracts, than to assume that the owner limited the rents it charged tenants under the hope that HUD would later choose to retroactively assume responsibility for the rent subsidies. *See also* Pl.'s App. at 12 (Dr. Harris stating that HUD gave him "a verbal extension" of the HAP contract at an August 1999 meeting).

## III. CONCLUSION

For the foregoing reasons, the government's motion to dismiss for lack of subject matter jurisdiction is **DENIED**. The parties shall file a Joint Status Report within twenty-eight days of the date of this order proposing a schedule for further proceedings.

**IT IS SO ORDERED.**

s/ Victor J. Wolski

**VICTOR J. WOLSKI**
Judge

---

1998 inspection. *See* Def.'s App. at 8, 62.

[32] This course of conduct may also establish HUD's recognition of the assignment to plaintiff. *See Tuftco Corp. v. United States*, 222 Ct. Cl. 277, 286 (1980).