<u>Forest Glen Properties, LLC v. United States</u>
No. 05-1006C

APPENDIX TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO AMEND ITS COMPLAINT:

Excerpts of Deposition of Frederick D. Harris, M.D. (September 15, 2006) . . . . . . . . . . . . . . . . 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| FOREST GLEN PROPERTIES, LLC | ) CASE NO. 05-1006C |
| | ) JUDGE WOLSKI |
| Plaintiff | ) |
| | ) DEPOSITION OF |
| vs | ) |
| | ) FREDERICK D. HARRIS, M.D. |
| U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT | ) |
| Defendant | ) |

Deposition taken before me, Wendy A. Klein, Notary Public within and for the State of Ohio, on the 15th day of September, 2006, at 9:30 AM, pursuant to notice, taken at the law offices of Guarnieri & Secrest, 151 East Market Street, Warren, Ohio, to be used in accordance with the United States Rules of Civil Procedure or the agreement of the parties in the aforesaid cause of action pending in the United States Court of Federal Claims.

Page 6

answer to something, that's fine. If you don't understand my question, that's fine. Please ask me to rephrase it or clarify it or anything like that. If you need a break, that's perfectly all right, too.
The only sort of -- couple of ground rules I have is that, number one, answer whatever question is pending before you take a break, and normally when people talk with one another, they shake heads and nod and say, "uh huh," things like that. For the court reporter's benefit, if you could answer all questions verbally with a "yes" or a "no" or a word answer, as opposed to something physical, it will make it easier for all of us.
The other thing is I will try to do this to you, and I expect you to do me the same courtesy: Try to let me finish my question, even though you might know what it's going to be. Let me finish my question before you

Page 7

answer, and I'll do my best to make sure you finish your answer beforehand.
A. Okay.
Q. Sir, I'm going to ask you to answer these questions without anything in front of you. If you'd like to refer to something in connection with an answer, you can do so, but I'd like you to, if possible, close your written materials. I'm not going to be quizzing you, though. So, if you do want to refer to, just tell me what you're referring to, and --
A. It's more for the date accuracy.
Q. Right. Well, I'm going to show you in a second a document that I just saw entitled "Chronology of Events," which may help things anyway, and we can keep that handy. Any questions before we begin?
A. No. You're going to allow me to refer to my documents as I come across for dates and times and that?
Q. Yeah.

Page 8

A. Because this is, you know, starting back in '98, over eight years ago, this whole process.
Q. I'm aware of that, and we'll have an opportunity to do that. The -- when we get to sort of the substance, let's -- let's do that. First let me just ask you, Sir, where you're currently employed?
A. Cleveland Clinic.
Q. And you are --
A. I'm an internist.
Q. Internist?
A. Board certified internist.
Q. How much of your time do you spend in connection with matters related to Forest Glen, as a percentage?
A. Forest Glen as a percentage? Probably less than -- pretty close to zero.
Q. Okay. Does Forest Glen own any other property -- well, does Forest Glen currently own any property?
A. Yes.
Q. What property is that?
A. You mean the property formerly known as

Page 9

Lakeview Gardens?
Q. Well, that's my question, but I want to make sure that that's --
A. That's -- that's it.
Q. That's the sole property? Are there any other partners in Forest Glen?
A. Yes.
Q. Who are they?
A. The other partner is Andrew Jackson.
Q. And is Forest Glen -- do you currently rent out the Forest Glen property to anyone?
A. Andrew manages the property. So, he runs it.
Q. Oh. Do you know what the property is used for at this time?
A. I mean, they're rental units. What do you mean, what it's used for?
Q. Well, that's my question. They're rental units. Are they currently full?
A. I haven't spoken to Mr. Jackson regarding that.
Q. Okay. When was the last time you spoke to Mr. Jackson?
A. Probably about a little bit over three

then the word "Principal" is crossed out and the word "Solo" is written in.
A. Right.
Q. I'm going to just ask you that, is that your handwriting that says "Solo"?
A. Yes. That was an error.
Q. What is Solo Ventures?
A. Solo Ventures is an LLC.
Q. And is there someone who is in charge of Solo Ventures, or was there?
A. Yeah. At the time, I was Solo Ventures.
Q. So, you were operating --
A. I was a member in managing operand of Solo Ventures.
Q. Was there anyone else who had an ownership interest in Solo Ventures?
A. No.
Q. Was there anyone else who was employed by Solo Ventures?
A. Employed, no.
Q. What assets, if any, did Solo Ventures own?
A. At that time?
Q. Yes.



A. Zero.
Q. Okay. And I take it that at some point, there was an $80,000 loan from Solo to Diversity; is that correct?
A. Right. Solo received a loan, obviously, from Fred Harris, which is me.
Q. Okay. And what was the purpose of that loan?
A. The purpose of the loan was to shore up some apartment buildings on Lakeview Avenue.
Q. And Diversity Institute, is that an entity that you had any affiliation with?
A. Zero.
Q. Do you know who the principals of Diversity Institute were?
A. I think her first name is Betty. There's some documents in here that she signed that I can give you her last name.
Q. Okay.
A. Betty Butler is coming to mind, but we can sort that out right now.
Q. When you find the document, I would just ask that you identify it so that we



have a record of which document you're using to remember this.
A. Okay. Betty Butler, CEO and executive director.
Q. Of which entity?
A. Y/A.W.A.R.E.
Q. Do you know the relationship between Y/A.W.A.R.E. and Diversity?
A. The same members of Y/A.W.A.R.E. -- or the same principals were the same principals in Diversity.
Q. Okay. So, let me try to understand this. Someone from Diversity -- Ms. Butler; is that what you said?
A. Yes.
Q. Approached you and asked if you or Solo Ventures would be willing to loan to Diversity $80,000 using the Lakeview Apartments buildings as collateral? Is that a fair assessment of what happened?
A. Yes.
Q. Did you know Ms. Butler before then?
A. Never met her in my life.
Q. Do you know why she came to you?



A. I was identified as a man of means.
Q. You state that as if perhaps that was an incorrect characterization. At the time that you made this loan -- it says here on the chronology, "Using the apartment buildings as collateral." Did you make any inquiry at the time to determine whether or not Diversity Institute was actually the owner of the apartment buildings?
A. What you have to understand here, this chronology was prepared by Mr. Jackson, and as I already went through and crossed out errors, I believe it was -- it may have just been to, you know, Y/A.W.A.R.E.
Q. Okay. So, you're not sure one way or another, or --
A. Well, it was to whatever institute that held the title.
Q. Okay. Was Mr. Jackson involved in the 6-98 transaction that's referred to in --
A. Zero.

Page 46

and you kind of just signed them and did what you were told?
A. Well, I understood it was a necessary step.
Q. Okay. I want to ask you to go two pages forward in that assignment document.
A. Uh huh.
Q. It's about six or seven pages from the very end of the whole thing. There's a page designated as "Consent," which would be a page, as I understand it, to be filled out or completed and notarized by a representative of the Department of Housing and Urban Development. Do you know if there's ever a -- if there was ever a signed version of this document? And when I say "this document," whether or not a representative of the Department of Housing and Urban Development ever signed this consent form?
A. Well, I knew this: No, that, obviously, is not signed, but I knew that we were in constant communication with the people from the local HUD office.

Page 47

They knew we were doing this and preparing this documentation, and so, it was understood that this is what we were doing with my conversation with Mr. Morton, the director.
Q. Okay. Did Mr. Morton ever tell you that the United States Department of Housing and Urban Development would consent to the assignment of the HAP contract -- of the rights under the HAP contract from --
A. If --
Q. Let me finish my question. From Y/A.W.A.R.E. to Solo?
A. It didn't matter, as far as I see. We had our own separate document with them directly.
Q. Okay. I understand that's your position. I want you to answer my question. I'll ask the court reporter to read it back just so we're clear what my question was.
(QUESTION ON PAGE 47 AT LINE 6 READ BY THE REPORTER)
A. That was my understanding.

Page 48

Q. What was that understanding based on?
A. That we was getting these extensions with HUD's blessing.
Q. How did you come to develop that understanding?
A. Well, because we had the contract. A contract that was signed the month before, had already been assigned.
Q. And when you said "we," you're referring to the contract entered into between the receiver on one hand and the Department of Housing and Urban Development on the other?
A. Right, but you got to understand it was my motion for receiver that he was appointed. It was my motion -- emergency motion for receiver that he was appointed.
Q. Okay. Did any other employee other than Mr. Morton ever tell you that the United States would consent to the assignment of the rights under the HAP contract from Y/A.W.A.R.E. to Solo?
A. All I know is I had the housing renewal

Page 49

contract that was signed by Mr. Morton.
Q. Okay.
A. On October 25, 1999.
Q. Okay.
A. And I didn't know necessarily if anything else was either needed or -- you know, or wanted.
Q. Did you have an understanding at that time how long the contract that's an exhibit to the complaint would be in effect for?
A. Yes, it's dated. It's dated. It was -- the initial contract was a start date of September 14, 1999. This contract was to expire on January 13, 2000.
Q. Okay. So, that --
A. It was a 120 day term.
Q. Okay.
A. Which was the first contract, which we never got a penny for, and that's why we're here today.
Q. Did -- pardon me, I lost my train of thought. This copy -- this consent form that's not completed on this